IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AJP EDUCATIONAL FOUNDATION, INC.    )
   d/b/a AMERICAN MUSLIMS FOR    )
   PALESTINE,    )
                                      )
        Plaintiff,    )
                                      )
   v.    )    1:25-cv-1617 (LMB/IDD)
                                      )
JASON S. MIYARES, in his official capacity as    )
   Attorney General of the Commonwealth of    )
   Virginia,    )
                                        )
        Defendant.    )
                                        )

## MEMORANDUM OPINION

Plaintiff AJP Educational Foundation, Inc. d/b/a American Muslims for Palestine ("AMP"), a non-profit organization "dedicated to advancing the movement for justice in Palestine by educating the American public about Palestine and its rich cultural, historical and religious heritage," [Dkt. No. 1] at ¶ 6, has filed a five-count Complaint against defendant Jason S. Miyares in his official capacity as the Attorney General of the Commonwealth of Virginia ("the AG") in connection with a Civil Investigative Demand ("CID") the AG initiated in October 2023. The Complaint alleges, among other claims, that the CID's request for AMP's donor lists violates the right to free association guaranteed by the First and Fourteenth Amendments to the United States Constitution. On October 1, 2025, AMP filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, which this Court granted after oral argument on October 3, 2025. This Memorandum Opinion expands upon the reasoning for granting AMP preliminary injunctive relief.

# I. BACKGROUND

## A. Statutory Framework

The Virginia Solicitation of Contribution ("VSOC") law, contained in Chapter 5 of Title 57 of the Virginia Code, regulates the solicitation of contributions by charitable organizations in the Commonwealth. Va. Code §§ 57-48 et seq. Three provisions are critical to the AG's investigation of AMP: §§ 57-49, 57-57, and 57-59.

Section 57-49(A) requires the president, chairman, or principal officer of a charitable organization intending to solicit contributions within the Commonwealth to file a registration statement with the Commissioner of Agriculture and Consumer Services "prior to any solicitation." The statement must "thereafter be refiled on or before the fifteenth day of the fifth calendar month of the next and each following fiscal year in which such charitable organization is engaged in solicitation activities within the Commonwealth." Va. Code § 57-49(A). Section 57-49 lists the information an organization must include in the registration statement:

> **1.** The name of the organization and the purpose for which it was organized.
> **2.** The principal address of the organization, the address of any offices in the Commonwealth and its designated agent for process within the Commonwealth. If no such agent is designated, the organization shall be deemed to have designated the Secretary of the Commonwealth. If the organization does not maintain an office, the name and address of the person having custody of its financial records.
> **3.** The names and addresses of any chapters, branches or affiliates in the Commonwealth.
> **4.** The place where and the date when the organization was legally established, the form of its organization, and a reference to any determination of its tax-exempt status under the Internal Revenue Code.
> **5.** The names and addresses of the officers, directors, trustees and the principal salaried executive staff officer.
> **6.** A copy of a balance sheet and income and expense statement, with the opinion of any independent public accountant, for the organization's immediately preceding fiscal year; a copy of a financial statement certified by an independent public accountant covering, in a consolidated report, complete information as to all the preceding year's fund-raising activities of the charitable organization, showing kind and amount of funds raised, fund-raising expenses and allocation of disbursement

of funds raised; or a copy of Internal Revenue Service Form 990. The report required by this subdivision shall comply with the accounting standards prescribed pursuant to § 57-53. Any organization whose annual gross revenue qualifies such organization to file Form 990-N (also referred to as the e-Postcard) with the Internal Revenue Service may submit a balance sheet and income and expense statement verified under oath or affirmation by the treasurer of the organization.

**7.** A statement indicating the amount of funds expended during the preceding fiscal year to pay for the administrative expenses of the charitable organization and a computation of such expenses as a percentage of the total expenses of the charitable organization.

**8.** A statement indicating the amount of funds expended during the preceding fiscal year that was dedicated to providing charitable services and a computation of such expenses as a percentage of the total expenses of the charitable organization.

**9.** A statement showing the computation of the percentages provided for in § 57-58.

**10.** A statement indicating whether the organization intends to solicit contributions from the public directly or have such done on its behalf by others.

**11.** A statement indicating whether the organization is authorized by any other governmental authority to solicit contributions and whether it, or any officer, professional fund-raiser or professional solicitor thereof, is or has ever been enjoined by any court or otherwise prohibited from soliciting contributions in any jurisdiction.

**12.** The general purpose or purposes for which the contributions to be solicited shall be used.

**13.** The name or names under which it intends to solicit contributions.

**14.** The names of the individuals or officers of the organization who will have final responsibility for the custody of the contributions.

**15.** The names of the individuals or officers of the organization responsible for the final distribution of the contributions.

**16.** A statement indicating whether the organization, or any officer, professional fund-raiser or professional solicitor thereof, has ever been convicted of a felony and, if so, a description of the pertinent facts.

**17.** A copy of the current articles of incorporation, bylaws, or other governing documents. If current copies are already on file with the Commissioner, only amendments, if any, shall be filed in years after the initial registration.

**18.** A description of the types of solicitation to be undertaken.

The registration statement must also contain the following language: "No funds have been or will

knowingly be used, directly or indirectly, to benefit or provide support, in cash or in kind, to

3

terrorists, terrorist organizations, terrorist activities, or the family members of any terrorist." Va. Code § 57-49(A1).

Of the 19 categories of information that must be included, only three require the identification of particular individuals associated with the charitable organization. First, § 57-49(A)(5) requires the identification of the organization's officers, directors, trustees, and principal salaried executive staff officers. Second, § 57-49(A)(14) requires the disclosure of the individuals or officers who have final responsibility for the custody of contributions. Third, § 57-49(A)(15) requires the identification of the individuals or officers responsible for the final distribution of contributions. Of significance to this case is the fact that § 57-49 does not require charitable organizations to disclose the names and contact information of all their employees, members, and volunteers, or of any donors.

Section 57-57 prohibits charitable organizations from engaging in various acts, including soliciting funds without having "duly registered" under Chapter 5, § 57-57(K); soliciting and collecting funds using fraud or misrepresentation, § 57-57(L); using funds for purposes other than the solicited purpose, § 57-57(N); and using funds to directly or indirectly benefit or support terrorists, terrorist organizations, or terrorist activities, § 57-57(R).

Section 57-59 details the various ways in which the provisions of Chapter 5 may be enforced, two of which are relevant here. First, § 57-59(D) permits the AG, whenever he "has reason to believe that any charitable or civic organization . . . is operating or is about to operate in violation of the provisions of [Chapter 5]," to bring "an action in the name of the Commonwealth against such charitable or civic organization . . . to enjoin the continuation of such violation." In such an action, a court may award "to the Commonwealth a civil penalty of not more than $5,000 per violation." Va. Code § 57-59(E). Second, § 57-59(C) provides that

4

whenever the AG has "reasonable cause" to believe that a charitable organization is operating in violation of the provisions of Chapter 5, the AG "may issue a civil investigative demand." Section 57-59(C) then specifies that "[t]he provisions of § 59.1-9.10 shall apply mutatis mutandis to civil investigative demands issued pursuant to this subsection."

Incorporated into § 57-59, § 59.1-9.10 regulates the AG's use of CIDs. Relevant here, § 59.1-9.10(F) states that an organization that is the subject of an investigation may petition the Circuit Court of the City of Richmond ("Circuit Court") to modify or set aside the CID. The petition must specify the grounds upon which the petitioner is seeking relief, and that request for relief may be based on "any constitutional or other legal right or privilege of such party." Va. Code § 59.1-9.10(F). Section 59.1-9.10(F) also includes a stay provision, which provides that "[t]he time allowed for compliance with the [CID] in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such a petition in the court."

### B. Civil Investigative Demand

AMP, like most other charitable organizations in the Commonwealth,[1] is required to comply with the VSOC law. Indeed, until October 2023, AMP believed it was in full compliance; however, on October 27, 2023, the AG, acting pursuant to § 57-59(C), mailed to AMP a CID in connection with an investigation into AMP's possible violations of §§ 57-49 and 57-57(K), (L), (N), and (R). [Dkt. No. 15-1] at 34. The CID stated:

> Based on information provided to our Office and on our own investigation, we have reason to believe that AMP may have solicited charitable contributions in the Commonwealth without first having been registered with the Commissioner of the Virginia Department of Agriculture and Consumer Services, employed misrepresentations in connection with the solicitation of charitable contributions, permitted the use of funds raised in a charitable solicitation for purposes other than

---

[1] AMP was incorporated in California in 2006 and has maintained a principal place of business in Falls Church, Virginia, since 2016. [Dkt. No. 1] at ¶¶ 20–21.

the solicited purpose, and knowingly used or permitted the use of funds raised by a solicitation of contributions to provide support to terrorists, terrorist organizations, terrorist activities, or family members of terrorists.

Id. The CID requested 31 categories of documents, including "[a]ll meeting minutes and agendas for any meeting of your board of directors, or any subcommittee of the board"; "[d]ocuments sufficient to identify all of your employees, including their position/title and time periods employed"; "[d]ocuments relating to any checking, depository, savings, investment, credit card, debit card, charge card, loan, or other financial account in any bank, credit union, or other institution or service"; and "[a]ll donor lists, including list-servs and email groups." Id. at 39–43. The CID also included 12 interrogatories, some of which contained several sub-parts. One interrogatory asked whether AMP provided funds to Hamas,[2] and another requested that AMP "[i]dentify all entities and persons (including, companies, nonprofits, and student organizations) to which you have disbursed money, and the amount of money disbursed to each entity or person." Id. at 44.

Four days after mailing the CID, on October 31, 2023, the AG announced through a press conference that he was initiating an investigation of AMP for potential violations of the VSOC law.[3] [Dkt. No. 1] at ¶ 12. The press release stated:

> The Attorney General's Office has reason to believe that the organization may be soliciting contributions in the Commonwealth without first having registered with the Commissioner of the Virginia Department of Agriculture and Consumer Services. In addition, the Attorney General will investigate allegations that the

---

[2] Hamas was placed on the U.S. Department of State's list of foreign terrorist organizations on October 8, 1997. Foreign Terrorist Organizations, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-organizations/.

[3] Although the CID was mailed before the October 31, 2023, press release, AMP alleges that it did not receive the CID until after the press release. [Dkt. No. 1] at ¶ 19.

organization may have used funds raised for impermissible purposes under state law, including benefitting or providing support to terrorist organizations.[4]

The term "state law" in the press release included a hyperlink to Chapter 5 of the Virginia Code. The term "allegations" in the press release included a hyperlink to a Memorandum Opinion and Order in Boim v. American Muslims for Palestine, 1:17-cv-3591, Dkt. No. 250 (N.D. Ill. May 17, 2022), which is part of ongoing litigation surrounding the 1996 murder of American student David Boim by Hamas terrorists in Jerusalem. In 2004, a federal district court in Illinois entered a $156 million judgment in favor of David's parents against an individual defendant and two American non-profit organizations, the Islamic Association for Palestine and the Holy Land Foundation for Relief and Development, under the Anti-Terrorism Act "for their role in funding Hamas." Boim v. Am. Muslims for Palestine, 9 F.4th 545, 547 (7th Cir. 2021). Shortly after the district court entered judgment, both organizations "announced they were closing," and "[l]ess than a year later, a new organization named American Muslims for Palestine emerged and then incorporated in 2006." Id. at 548. "Some of the Islamic Association's former leaders migrated to positions at the new American Muslims for Palestine organization, and the new organization held its first convention in November 2006 at the same location and during the same time of year as the Islamic Association had done in the past." Id. at 548–49. Observing these developments, David's parents sued AMP in an effort to collect their $156 million judgment. Id. at 549. That litigation—which

---

[4] Attorney General's Office Opens Investigation Into American Muslims for Palestine Nonprofit, Off. of the Att'y Gen. (Oct. 31, 2023), https://www.oag.state.va.us/media-center/news-releases/2630-october-31-2023-attorney-generals-office-opens-investigation-into-american-muslims-for-palestine-nonprofit.

centers around the critical issue of whether AMP is the alter ego of the now-defunct organizations found liable in 2004—is currently in discovery. <u>See Boim v. Am. Muslims for Palestine</u>, 1:17-cv-3591, Dkt. No. 590 (N.D. Ill. Sept. 30, 2025).

After AMP learned of the VSOC law's requirements, it registered with the Commissioner of the Virginia Department of Agriculture and Consumer Services in November 2023. [Dkt. No. 1] at ¶ 25; [Dkt. No. 15] at 4. The AG does not dispute that AMP's November 2023 registration fully complied with the statute,[5] and counsel for AMP represented to this Court during oral argument that AMP has consistently complied with all other federal and state filing requirements. Moreover, on December 7, 2023, AMP responded to portions of the CID that it did not challenge, [Dkt. No. 1] at ¶ 31, although it is unclear from the record before this Court whether AMP's responses were satisfactory, <u>see</u> [Dkt. No. 15] at 1 n.1.

C. <u>AMP's Petition for an Order to Modify or Set Aside the CID</u>

On November 27, 2023, AMP filed a Petition for an Order to Modify or Set Aside Attorney General's Investigative Demand ("Petition to Modify") in the Circuit Court pursuant to § 59.1-9.10(F). [Dkt. No. 1-2] at 1. The Petition to Modify contested the scope of the CID—not its initiation—stating that AMP "agrees to comply" with the "legitimate purpose" of ensuring compliance with the VSOC law but that the CID "goes far beyond that legitimate purpose and exceeds the scope of the Attorney General's authority." <u>Id.</u> at 2–3. In particular, AMP contended that the CID "improperly seeks detailed information regarding donors, including donors from outside the State of Virginia and donations not reasonably related to the legitimate timeframe or topics at issue here." <u>Id.</u> at 3. AMP also claimed that many of the CID's requests

---

[5] The AG has made clear, however, that AMP's November 2023 registration does not "erase . . . prior non-compliance." [Dkt. No. 15-2] at 33 n.7.

were "vague and unclear" and sought information "protected by the attorney client work product privileges." Id.

Regarding its First Amendment challenge, AMP argued that the CID "seeks not only to chill AMP and other organizations advocating for Palestinian rights from operating in the Commonwealth of Virginia, but will also violate the privacy rights of its supporters and donors, and those of other organizations advocating for Palestinian rights or other causes not in the favor of the current Attorney General of Virginia." Id. at 5. AMP also emphasized that the U.S. Supreme Court has "repeatedly held that laws requiring the disclosure of membership lists for groups seeking anonymity are unconstitutional because they necessarily make 'group membership less attractive' and 'affect[] the group's ability to express its message' in violation of the First Amendment." Id. at 7 (quoting Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 69 (2006)). Accordingly, AMP requested that the Circuit Court "[m]odify or set aside the CID in its entirety" or, in the alternative, "[p]rohibit the Attorney General from compelling [AMP] to disclose documents and information that reveal information related to donors, members, and supporters, or from taking any action to implement or enforce his demand for this information." Id. at 16–17.

The AG responded that his request for AMP's donor information was "constitutionally permissible because [it is] being sought in the context of a targeted investigation and because the information sought is reasonably necessary for the Attorney General to determine whether the relevant statutes have been violated." [Dkt. No. 15-1] at 2–3. The AG contended that the donor information "is reasonably pertinent to a bona fide government investigation" because it would "tend to corroborate or disprove amounts reported on the organization's Form 990," "allow the Attorney General to ascertain donor victims to whom he may inquire about what representations

may have been made incident to charitable solutions," "demonstrate organizational motive," and

"tend to show the number of violations of the state's registration statute." Id. at 28, 30–31.

Accordingly, the AG asked the Circuit Court to deny AMP's Petition to Modify.

On July 30, 2024, the Circuit Court entered an order that stated:

> The Court FINDS that the Attorney General was entirely within his statutory authority to initiate a Civil Investigative Demand, because American Muslims for Palestine directly admitted it did not properly file its Initial Registration Statement, in violation of the Virginia Solicitation of Contributions Law (VSOC), Code §§ 57-59 and 57-57(K). This violation provided per se reasonable cause for legitimate concerns as to whether funds were being used for their stated purpose pursuant to §§ 57-59 and 59.1-9.10. Therefore, the Court FINDS that the Attorney General acted in good faith and reasonably in accordance with the statutory requirement and has not exceeded its authority. Consequently, the Petition for an Order to Modify or Set Aside the Attorney General's Civil Investigative Demand is DENIED.

[Dkt. No. 1-3] at 1–2. The Circuit Court's order did not address or acknowledge the parties'

constitutional arguments, even though the Circuit Court "questioned AMP's counsel regarding

all of AMP's arguments, including those concerning the constitutionality . . . and purported

overbreadth of the Attorney General's CID requests." [Dkt. No. 15] at 5. AMP timely filed an

appeal with the Court of Appeals of Virginia ("Court of Appeals"), [Dkt. No. 1] at ¶ 39, and the

appeal is still pending. Oral argument was held on July 15, 2025, during which the parties were

questioned about the potential constitutional issues.[6]

During that argument, AMP notified the Court of Appeals about First Choice Women's

Resource Centers, Inc. v. Platkin, in which the U.S. Supreme Court granted certiorari on June 16,

2025, to consider the following question: "Where the subject of a state investigatory demand has

---

[6] Audio of Oral Argument, AJP Educational Foundation, d/b/a American Muslims for Palestine v. Jason Miyares, In His Official Capacity as the AG of the Commonwealth of Virginia, No. 1420-24-2 (Va. Ct. App. July 15, 2025), https://www.vacourts.gov/coa/oral-arguments/archive?field_release_date_value=07/15/2025&session_date=20250715&region=74.

established a reasonably objective chill of its First Amendment rights, is a federal court in a first-filed action deprived of jurisdiction because those rights must be adjudicated in state court?"[7] Petition for Writ of Certiorari, First Choice Women's Res. Ctrs., Inc. v. Platkin, No. 24-3124. First Choice involved an investigatory subpoena that the New Jersey AG sent to the faith-based pregnancy center seeking its donor list. First Choice Women's Res. Ctrs., Inc. v. Platkin, 2024 WL 5088105, at *1 (3d Cir. Dec. 12, 2024). After the center challenged the subpoena under 42 U.S.C. § 1983 in federal court, the New Jersey AG filed a motion in state court to enforce the subpoena. Id. The New Jersey state court granted the motion without ruling on the center's constitutional claims. Id. The federal district court then found that First Choice's constitutional claims were not ripe for review, and the Third Circuit affirmed, finding that the center "can continue to assert its constitutional claims in state court as that litigation unfolds" and observing that the parties had successfully negotiated to narrow the subpoena's scope. Id.

After raising First Choice as a potentially relevant case, the Virginia Court of Appeals requested that AMP and the AG submit supplemental briefing on the issue. [Dkt. No. 15-5] at 1. The AG has attached as an exhibit in this case his supplemental briefing, which reflects that he argued that First Choice has "no bearing on this matter because it will merely decide when a subpoena recipient's claims are ripe for adjudication in a first-filed action in federal court, and not the propriety of the subpoena requests themselves." Id. at 4. The record before this Court does not contain AMP's supplemental briefing on the issue. As of October 16, 2025, the parties have not informed this Court as to whether the Court of Appeals has issued its decision. [Dkt. No. 15-5] at 1–2; [Dkt. No. 15] at 6.

---

[7] As of October 16, 2025, the Supreme Court had not yet scheduled oral argument in First Choice.

11

D. AMP's Stay Requests

AMP has sought two stays pending a decision by the Court of Appeals regarding the Circuit Court's July 30, 2024, order. First, on August 5, 2024, AMP filed a Motion for Stay Pending Appeal or, in the Alternative, for Specification Supersedeas Bond Amount in the Circuit Court seeking an order clarifying that § 59.1-9.10(F)'s stay provision "is applicable not merely during the pendency of this action before this Court, but also during the pendency before the Commonwealth's courts of appeal." [Dkt. No. 1] at ¶ 40; [Dkt. No. 15-3] at 1–2. In an October 11, 2024, order denying that request, the Circuit Court found that "[a] request to provide binding adjudication as to the interpretation of a statute is a request for declaratory judgment," which is "not among the enumerated matters over which this Court retains concurrent jurisdiction after appeal." [Dkt. No. 15-3] at 2. In other words, because AMP had filed a notice of appeal of the Circuit Court's order, the Circuit Court believed that it lacked jurisdiction to consider whether § 59.1-9.10(F)'s stay provision permitted a stay during the pendency of AMP's appeal. AMP sought reconsideration of that order, which the Circuit Court denied on November 6, 2024. [Dkt. No. 15-4] at 1. Second, on May 14, 2025, AMP asked the Court of Appeals to stay any further trial court proceedings in the Circuit Court while its appeal was pending. [Dkt. No. 15-9]. The Court of Appeals denied that request in a June 9, 2025, order that did not articulate the grounds for the denial. Id.

E. AG's Petition to Enforce the CID

Meanwhile, on January 14, 2025, the AG filed a Petition to Enforce Civil Investigative Demand ("Petition to Enforce") in the Circuit Court. [Dkt. No. 15-6]. The AG contended that, "despite conceding that it had violated Virginia law governing charitable solicitations, AMP

12

sought to evade accountability for soliciting contributions in violation of Virginia law by lodging a meritless challenge to the Attorney General's investigation and repeatedly attempting to delay that investigation." Id. at 2. That same day, the AG issued a press release indicating that he had filed a Petition to Enforce and stating that the CID "requested records relating to AMP's noncompliance with the state's charitable solicitation law and an investigation into allegations that the organization may have used raised funds for impermissible purposes, such as benefiting or providing support to terrorist organizations."[8] [Dkt. No. 1] at ¶ 45.

On May 9, 2025, the Circuit Court granted the AG's Petition to Enforce, explaining that the stay contemplated by § 59.1-9.10(F) ends when the proceedings surrounding a plaintiff's petition to modify or set aside a CID have concluded in, according to the statutory language, "the court." [Dkt. No. 15-7] at 2 (quoting Va. Code § 59.1-9.10(F)). Although the Circuit Court found that a contrary interpretation would "gut the Attorney General's authority to engage in pre-enforcement civil investigations," it failed to address AMP's serious constitutional concerns and held that the statutory phrase "the court" refers exclusively to the Circuit Court of the City of Richmond, not the Court of Appeals.[9] Id. Accordingly, because the proceedings before the Circuit Court on AMP's Petition to Modify concluded, the court found that the stay provision was inapplicable and ordered AMP to comply with the CID. Id. The AG followed this order

---

[8] Attorney General Holds American Muslims for Palestine Accountable for Refusing to Comply with Investigation, Off. of the Att'y Gen. (Jan. 14, 2025), https://www.oag.state.va.us/media-center/news-releases/2825-january-14-2025-attorney-general-miyares-holds-american-muslims-for-palestine-accountable-for-refusing-to-comply-with-investigation.

[9] The Circuit Court inferred that, because subsection (F) refers elsewhere to "the Circuit Court of the City of Richmond," subsection (F)'s subsequent reference to "the court" must also refer to the Circuit Court of the City of Richmond. [Dkt. No. 15-7] at 2. At the October 3, 2025, hearing before this Court, plaintiff's counsel represented that, when § 59.1-9.10(F) was enacted, Virginia law did not provide for an appeal as of right from the Circuit Court to the Court of Appeals.

with another press release dated May 13, 2025, asserting that AMP "may have used solicited funds for impermissible purposes, such as benefiting or providing support to terrorist organizations."[10] [Dkt. No. 1] at ¶ 47.

On June 13, 2025, the Circuit Court entered another order stating that "[t]he stay provision in Va. Code § 59.1-9.10[F] is lifted once a matter regarding a petition to modify or set aside a civil investigative demand is finalized in the Circuit Court of the City of Richmond." [Dkt. No. 1-4] at 10.  Accordingly, the Circuit Court required AMP "to fully comply with and respond to the Attorney General's Civil Investigative Demand by producing all remaining responsive documents, and responding to the interrogatories under oath within 14 days of entry of this Order." Id. at 11.

Despite the Circuit Court's June 13, 2025, order, AMP still did not respond—and has not responded—to the portions of the CID it believes to be unconstitutional.  [Dkt. No. 1-4] at 4. Accordingly, on August 5, 2025, the AG filed a Motion for Rule to Show Cause in the Circuit Court, asking the court "for a Rule to Show Cause why [AMP] should not be held in contempt for violating the Court's June 13, 2025, Order." Id. at 7.  On August 26, 2025, the Circuit Court entered a Rule to Show Cause ordering AMP to appear before the court on September 29, 2025, to "show cause why it should not be sanctioned pursuant to a finding of contempt" for its violation of the Circuit Court's June 13, 2025, order. Id. at 15.

---

[10] Attorney General Miyares Secures Court Decision Requiring American Muslims for Palestine to Comply with Investigation, Off. of the Att'y Gen. (May 13, 2025), https://www.oag.state.va.us/media-center/news-releases/2865-may-13-2025-attorney-general-miyares-secures-court-decision-requiring-american-muslims-for-palestine-to-comply-with-investigation.

On September 29, 2025, the parties appeared before the Circuit Court, which found that AMP was "in civil contempt of the Court's Order of June 13, 2025." [Dkt. No. 15-10] at 1. Accordingly, the Circuit Court ordered AMP to pay the AG's "reasonable costs and attorney's fees" in the amount of $8,000 and stated that AMP's failure to comply by October 3, 2025, will result in additional sanctions of $1,000 per day. Id. at 2. To this date, no court has ruled on AMP's constitutional objections to certain requests contained in the CID. [Dkt. No. 1] at ¶ 52.

F. This Civil Action

AMP filed a five-count Complaint in this Court on September 26, 2025. [Dkt. No. 1]. Count I alleges that the CID "wrongfully curtails AMP's protected speech" in violation of the First Amendment. Id. ¶¶ 54–64. Count II alleges that the CID's broad scope and request for AMP's donor lists chills the right to free association in violation of the First Amendment. Id. ¶¶ 65–75. Count III states a claim under § 1983 alleging that the AG retaliated against AMP in response to AMP's exercise of protected First Amendment activity. Id. ¶¶ 76–83. Count IV alleges that the AG engaged in viewpoint discrimination in violation of the First and Fourteenth Amendments. Id. ¶¶ 84–88. And Count V alleges that the "overly broad CID" constitutes an unreasonable search and seizure in violation of the Fourth Amendment. Id. ¶¶ 89–98.

AMP filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction on October 1, 2025, [Dkt. No. 9], and served the AG with the Complaint the next day, [Dkt. No. 15] at 10. On October 3, 2025, this Court, after a hearing with both parties present, entered an Order granting AMP's motion, which stayed the execution of the Circuit Court's September 29, 2025, order and enjoined the AG from enforcing the CID "to the extent that it would require the disclosure of information protected by the First Amendment . . . until the dispute between the parties has been fully adjudicated through the Virginia state court system."

15

[Dkt. No. 19].  The Court also ordered AMP to post a $8,000 bond, id., which AMP did later that day, [Dkt. No. 21].

## II. DISCUSSION

### A. Threshold Issues

The AG raises various challenges to the jurisdiction of this Court and to AMP's ability to raise its constitutional claims: (1) issue and claim preclusion, (2) the Rooker-Feldman doctrine, (3) abstention from the exercise of jurisdiction under Younger v. Harris, and (4) sovereign immunity.  After addressing these threshold issues, the Court will turn to AMP's likelihood of success on the merits and the remaining Winter factors.

### 1. Preclusion

First, the AG argues that AMP's constitutional claims are barred by issue and claim preclusion because AMP has already litigated those issues in state court proceedings regarding its Petition to Modify.  [Dkt. No. 15] at 12–17.  To determine the preclusive effect of a state court judgment in federal court, the federal court must look to the preclusion law of the judgment-rendering state.  Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482 (1982).  Under Virginia law, a party seeking to assert issue preclusion must establish that: "(1) the parties [or their privies] to the two proceedings must be the same, (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding, (3) the issue of fact must have been essential to the prior judgment, and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied."  Lane v. Bayview Loan Serv'g, LLC, 831 S.E.2d 709, 714 (Va. 2019) (quoting Glasco v. Ballard, 452 S.E.2d 854, 855 (Va. 1995)).  A party seeking to assert claim preclusion must establish that "(1) there has been a final judgment on the merits, (2) the parties or privies are the same, and (3) the later

16

lawsuit arises from the same conduct, transaction, or occurrence as the earlier lawsuit." Alexander v. Cobb, 838 S.E.2d 227, 231 (Va. 2020).

The "essential" factor in both analyses is whether there has been a final judgment on the merits. Kellogg v. Green, 809 S.E.2d 631, 635 (Va. 2018). The AG argues that the Circuit Court's July 30, 2024, order denying AMP's Petition to Modify is a "final judgment." [Dkt. No. 15] at 14. As the record shows, this argument is incorrect. Virginia law is clear that "a judgment is not final for the purposes of res judicata or collateral estoppel when it is being appealed or when the time limits fixed for perfecting the appeal have not expired." Faison v. Hudson, 417 S.E.2d 302, 305 (1992). Because AMP timely filed an appeal of the Circuit Court's July 30, 2024, order with the Court of Appeals, and because the appeal has not fully progressed through the Virginia appellate process, the Circuit Court's July 30, 2024, order does not constitute a final judgment for preclusion purposes.[11]

2. Rooker-Feldman

Second, the AG argues that this Court lacks jurisdiction to consider AMP's constitutional claims under the Rooker-Feldman doctrine because those issues were "already decided by Virginia state courts." [Dkt. No. 15] at 17. Under Rooker-Feldman, a federal district court "has no authority to review final judgments of a state court in judicial proceedings." D.C. Ct. of App. v. Feldman, 460 U.S. 462, 482 (1983); see Rooker v. Fidelity Tr. Co., 263 U.S. 413, 416 (1923).

---

[11] The AG cites Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J., 105 F.4th 67 (3d Cir. 2024), and Exxon Mobil Corp. v. Healy, 28 F.4th 383 (2d Cir. 2022), for the proposition that AMP is precluded from raising its constitutional claims in this Court. These cases are inapposite because both involved a final judgment, which rendered preclusion appropriate under New Jersey and Massachusetts law, respectively. Smith & Wesson Brands, 105 F.4th at 76 (finding that the state court's order was a "valid, final judgment on the merits"); Exxon Mobil, 28 F.4th at 401–02 (holding that the state court's order—which was appealed through the state court system and to the U.S. Supreme Court, which denied certiorari—was a "final order").

17

In Rooker, a party who lost in the Indiana Supreme Court filed an action in federal district court to challenge the constitutionality of the state court judgment. 263 U.S. at 414. The U.S. Supreme Court held that the federal court lacked jurisdiction because Congress had vested jurisdiction to entertain an appeal from the state's highest court only in the U.S. Supreme Court. Id. at 415–16. Similarly, in Feldman, a District of Columbia ("D.C.") court denied the plaintiffs' requests for waiver of a bar membership rule, leading the plaintiffs to sue D.C.'s highest court in federal court. 460 U.S. at 471–72. The U.S. Supreme Court held that the plaintiffs could not challenge the judgment in federal district court because review of the D.C. court's decision could be obtained only in the U.S. Supreme Court. Id. at 486 (citing 28 U.S.C. § 1257). The Supreme Court has since clarified that Rooker-Feldman "is confined to cases of the kind from which it acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). "When there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of a judgment in state court." Id. at 292.

This doctrine is inapplicable to the facts of this case because AMP is not seeking to bypass the Supreme Court's exclusive jurisdiction to review the decisions of state appellate courts. As explained above, Rooker-Feldman is limited to a narrow set of cases where "the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment." Exxon Mobil, 544 U.S. at 291 (emphasis added). But AMP has "not called upon" this Court "to exercise appellate jurisdiction over a final judgment" of either the Virginia Supreme Court or the U.S. Supreme Court. Thana v. Bd. of License Comm'rs for Charles Cnty., 827 F.3d 314, 321 (4th Cir. 2016) (citing 28

U.S.C. § 1257(a)).  AMP is not even inviting this Court to review the judgment of the Circuit

Court; rather, AMP is merely asking this Court to stay enforcement of the CID pending appellate

review of the Circuit Court's order.  The purpose of granting preliminary injunctive relief here is

simply to preserve the status quo until the appeal process has been completed.  Accordingly,

Rooker-Feldman does not bar this Court from exercising jurisdiction.

    3. Abstention

    Third, the AG argues that this Court "should abstain from exercising [jurisdiction]

pursuant to the Younger abstention doctrine." [Dkt. No. 15] at 19.  As a general rule, federal

courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given to them,"

Colo. River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976), and "[p]arallel

state-court proceedings do not detract from that obligation." Sprint Commc'ns, Inc. v. Jacobs,

571 U.S. 69, 77 (2013).  Younger recognized an exception to that rule: Federal courts should

decline to enjoin pending state criminal prosecutions absent any showing of bad faith,

harassment, or a patently invalid state statute.  401 U.S. 37, 54 (1971).

    The Supreme Court has since applied Younger to "bar federal relief in certain civil

actions," Sprint, 571 U.S. at 77 (citing Huffman v. Pursue, Ltd., 420 U.S. 592 (1975)), and has

more recently clarified that only three "exceptional circumstances justify a federal court's refusal

to decide a case in deference to the States." New Orleans Pub. Serv., Inc. v. Council of City of

New Orleans, 491 U.S. 350, 367–68 (1989) ("NOPSI").  First, Younger precludes "federal

intrusion into ongoing state criminal prosecutions." Sprint, 571 U.S. at 78.  Second, "certain

'civil enforcement proceedings' warrant abstention." Id. (quoting NOPSI, 491 U.S. at 368).

Finally, federal courts should refrain from interfering in pending "civil enforcement proceedings

involving certain orders uniquely in furtherance of the state courts' ability to perform their

judicial functions." Id. (quoting NOPSI, 491 U.S. at 368). The Court has "not applied Younger outside these three 'exceptional' categories" and has emphasized that these categories "define Younger's scope." Id.

The AG argues that a federal court should abstain under Younger when "(1) there is an ongoing state judicial proceeding brought prior to substantial progress in the federal proceeding that; (2) implicates important, substantial, or vital state interests; and (3) provides adequate opportunity to raise constitutional challenges." [Dkt. No. 15] at 19 (quoting Nivens v. Gilchrist, 444 F.3d 237, 241 (4th Cir. 2006)). The Fourth Circuit derived that three-part test from the Supreme Court's opinion in Middlesex County Ethics Commission v. Garden State Bar Association, 457 U.S. 423, 432 (1982); however, the Supreme Court has since clarified that the Middlesex factors do not operate as a free-standing test. In Sprint, the Court criticized the "extraordinary breadth" the Eighth Circuit had ascribed to the Middlesex factors, clarifying that those factors are "not dispositive" but rather "additional factors appropriately considered by [a] federal court before invoking Younger." 571 U.S. at 81. A contrary reading of Middlesex would be "irreconcilable" with the Supreme Court's "dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" Id. at 81–82 (quoting Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 236 (1984)). Accordingly, a federal court considering Younger abstention may consider the Middlesex factors only after concluding that a state proceeding falls within the three exceptional circumstances the Supreme Court identified in NOPSI and Sprint. See id. at 82.

Against this backdrop, this Court must determine whether the state proceedings relating to AMP's Petition to Modify and the AG's Petition to Enforce fit within those three exceptional circumstances. This case clearly does not involve federal intrusion into an ongoing criminal

20

prosecution.  Moreover, the state proceedings relating to the AG's Petition to Enforce are not the type courts have found to warrant abstention.  <u>Younger</u> applies in the civil enforcement context where a state proceeding is "'akin to a criminal prosecution' in 'important respects.'"  <u>Sprint</u>, 571 U.S. at 79 (quoting <u>Huffman</u>, 420 U.S. at 604).  In this genre of cases, several characteristics are relevant, including whether the enforcement action has been "initiated to sanction the federal plaintiff . . . for some wrongful act," whether a state actor initiated the action, and whether investigations culminated "in the filing of a formal complaint or charges."  <u>Id.</u> at 79–80.  Such actions include state-initiated disciplinary proceedings against a lawyer for violations of state ethics rules, <u>Middlesex</u>, 457 U.S. 423, and state-initiated administrative proceedings to enforce state civil rights laws, <u>Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.</u>, 477 U.S. 619 (1986).

An action to enforce a CID does not fit this description.  The Third Circuit's opinion in <u>Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.</u>, 27 F.4th 886 (3d Cir. 2022), provides helpful guidance.  There, the New Jersey AG, who was investigating Smith & Wesson for possible violations of New Jersey law, issued a subpoena seeking company records.  <u>Id.</u> at 889.  Smith & Wesson filed a § 1983 action in federal court alleging the subpoena violated various constitutional provisions.  <u>Id.</u>  The New Jersey AG then filed an enforcement action in state court, and the federal trial court abstained; however, the Third Circuit reversed, stating that, although the state proceeding was initiated by the New Jersey AG, it was not comparable to a criminal prosecution.  <u>Id.</u> at 890–92.  The Third Circuit distinguished subpoena enforcement actions "from those where more robust preliminary investigation led to the filing of administrative complaints" and explained that the enforcement action "did not punish wrongdoing."  <u>Id.</u> at 891–92.  Because the New Jersey AG "did not allege that Smith & Wesson violated any substantive legal duty," the Third Circuit concluded that a "subpoena enforcement

21

action that requires the production of documents is not retributive in nature or imposed to punish . . . some wrongful act." Id. at 892–93 (cleaned up).

A federal district court in Washington, D.C., recently reached a similar conclusion in Media Matters for America v. Bailey, which involved a state enforcement proceeding relating to a CID that the Missouri AG sent to Media Matters seeking its donor lists. 2024 WL 3924573, at *3 (D.D.C. Aug. 23, 2024). After the Missouri AG filed a petition to enforce in state court, Media Matters "moved to enjoin enforcement" in federal court, arguing that the Missouri AG retaliated against Media Matters in violation of the First Amendment.[12] Id. at *3–4. The court rejected the argument that it should abstain under Younger, explaining that the state action "involved no preliminary investigation and alleged only a violation of a procedural rule governing the production of records, not a substantive legal duty." Id. at *6. The court also clarified that the possibility of a civil penalty did not transform the enforcement action into an action akin to a criminal prosecution because the enforcement action "was not the culmination of an investigation into the alleged wrongdoing"; rather, the Missouri AG was "just at the investigation stage." Id.

The same analysis applies to AMP's civil action. The AG's Petition to Enforce is not akin to a criminal prosecution because it does not attempt to punish wrongdoing; rather, it seeks to enforce a procedural rule requiring the disclosure of documents upon receiving a CID. Moreover, the Circuit Court's imposition of a monetary sanction is of no consequence because

---

[12] On November 16, 2023, Media Matters reported that advertisements for major corporations were appearing next to extremist content on X.com. Media Matters, 2024 WL 3924573, at *1. Three days later, "a former senior aide to President Donald Trump, Stephen Miller, sent a tweet implicitly calling upon 'conservative' state attorneys general to investigate Media Matters's reporting on X." Id. at *2. The Missouri AG responded within hours that his "team was looking into the matter," and notified Media Matters of a pending investigation a few weeks later. Id.

the AG was just at the initial stages of his investigation and had not yet conducted a robust

inquiry into AMP's alleged wrongdoing.

Finally, the state proceedings relating to the AG's Petition to Enforce do not fall within

the third category of exceptional circumstances in which Younger applies.  Two cases

traditionally define this category, and Juidice v. Vail, which involves a state civil contempt order,

is most relevant in this civil action.[13]  430 U.S. 327 (1977).  At first blush, Juidice may seem to

require this Court to abstain; however, a careful read reveals a critical distinction between

Juidice and the facts presented here.  In Juidice, the Supreme Court considered "whether, with

the existence of an available forum for raising constitutional issues in a state judicial proceeding,

the United States District Court could properly entertain [the plaintiffs'] § 1983 action in light

of" Younger.  Id. at 330.  The Court observed that a state has an important interest in the regular

operation of its contempt process "so long as that system itself affords the opportunity to pursue

federal claims within it."  Id. at 335.  And because the plaintiffs "had an opportunity to present

their federal claims in the state proceedings," abstention was required.  Id. at 337.  But unlike the

plaintiffs in Juidice, AMP has not been "accorded . . . an opportunity to fairly pursue their

constitutional claims in the ongoing state proceedings."  Id.  Instead, AMP has been held in

contempt for violating a state court order directing it to respond to a CID while there is an appeal

---

[13] The other case that conventionally defines this third category is Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987).  At issue in Pennzoil was a Texas law that allowed a judgment creditor to secure and execute a lien on a judgment debtor's property unless the debtor posted a supersedeas bond in the amount of the judgment plus interest and costs.  Id. at 5.  After trial, it was determined that the bond required by Texas's law "would have been more than $13 billion," and because "Texaco would not have been able to post such a bond," it sought relief in federal district court, arguing that the state requirement for posting bond pending appeal conflicted with federal law.  Id. at 5–6.  The U.S. Supreme Court ultimately held that the lower federal courts should have abstained to avoid unwarranted intrusion into the Texas judicial system.  Id. at 10.

pending in the state system as to the constitutionality of that same CID. As the Court's reasoning in Juidice reflects, where there is apparently no other forum in which to obtain temporary relief from a potentially unconstitutional state demand, Younger abstention is inappropriate.

Because the state proceeding at issue does not fall within the Younger taxonomy, this Court need not consider whether the Middlesex factors the AG identified in his brief support abstention. See Sirva Relocation, LLC v. Richie, 794 F.3d 185, 193 (1st Cir. 2015); Horowitz v. Mason, 2016 WL 1536321, at *3 & n.3 (D. Md. Apr. 15, 2016). In sum, "[b]ecause this case presents none of the circumstances the [Supreme] Court has ranked as 'exceptional,' the general rule governs: '[T]he pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" Sprint, 571 U.S. at 73 (quoting Colo. Riv., 424 U.S. at 817). Accordingly, this Court declines to abstain under Younger.

4. Sovereign Immunity

Finally, the AG argues that "AMP's desired relief is . . . barred by the Commonwealth's sovereign immunity." [Dkt. No. 15] at 21. It is well-established that the Eleventh Amendment does not bar a suit for prospective relief against a state officer in his official capacity. Ex parte Young, 209 U.S. 123, 160 (1908); Edelman v. Jordan, 415 U.S. 651, 665 (1974). As Ex parte Young explained, "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer . . . is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." 209 U.S. at 159–60. The AG argues that "state officers acting in their official capacity are entitled to Eleventh Amendment protection because 'a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office' and, '[a]s such, it is no different from a suit against the State itself.'" [Dkt. No. 15] at 21 (citing Will v.

Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  The AG's reliance on Will is unavailing because that case focused on who qualifies as a "person" within the meaning of § 1983, not whether a state officer is entitled to Eleventh Amendment immunity.  491 U.S. at 60.  The Will Court concluded that neither a state, nor its officers acting in their official capacities when sued for retrospective relief, were "persons" under § 1983, which explains the quote the AG relied upon in his brief.  Id. at 71 & n.10.

AMP has clearly sued the AG in his official capacity.  Moreover, although the AG is correct that Ex parte Young applies only when the relief a plaintiff seeks is prospective, AMP's request for injunctive relief does not seek relief for conduct that occurred entirely in the past.  Rather, AMP seeks to enjoin the AG from continuing to enforce a potentially unconstitutional demand until the dispute between the parties has been fully litigated through the Virginia court system.  Accordingly, the doctrine of sovereign immunity does not bar AMP's requested relief.

B.  Winter Factors

A party seeking either a temporary restraining order or a preliminary injunction "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "[E]ach of these four factors must be satisfied" to obtain relief.  Henderson for NLRB v. Bluefield Hosp. Co., 902 F.3d 432, 439 (4th Cir. 2018).

1.  Likelihood of Success on the Merits

To meet the first factor, a movant must establish that it is "likely to succeed on the merits of at least one claim."  Roe v. Shanahan, 359 F. Supp. 3d 382, 409 (E.D. Va. 2019).  The movant must show more than merely "a grave or serious question for litigation," Sarsour v. Trump, 245

25

F. Supp. 3d 719, 729 (E.D. Va. 2017) (citation omitted), but need not show "a certainty of success," League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted). AMP's Complaint contains various claims under the First, Fourth, and Fourteenth Amendments, but at the heart of AMP's objections to the CID is its claim that the AG's request for "[a]ll donor lists, including list-servs and email groups," [Dkt. No. 15-1] at 39, violates the right to free association guaranteed by the First and Fourteenth Amendments.[14] See NAACP v. Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958).

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has "long understood as implicit in the right to engage in the activities protected by the First Amendment a corresponding right to associate with others." Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984). Governmental infringement on the right to free association "can take a number of forms," id., such as punishing public employees for their political affiliations, Elrod v. Burns, 427 U.S. 347, 355 (1976) (plurality opinion), and denying benefits to members of an organization based on the organization's message, Healy v. James, 408 US. 169, 181–82 (1972). And "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." Patterson, 357 U.S. at 462.

---

[14] Because the Court finds that AMP has established that it is likely to succeed on the merits of its free association claim, the Court need not consider AMP's other constitutional arguments. See Roe, 359 F. Supp. 3d at 410 & n.29.

In First Amendment challenges to compelled disclosure, courts apply "exacting scrutiny," which requires the government to demonstrate that there is a "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." Am. for Prosperity Found. v. Bonta, 594 U.S. 595, 607 (2021) (citations omitted). Although exacting scrutiny does not require a disclosure demand to be the least restrictive means of achieving the government's goals, it does require the demand to be narrowly tailored. Id. at 608; see McCutcheon v. FEC, 572 U.S. 185, 218 (2014) ("In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require a fit . . . that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." (cleaned up)).

The AG argues that he has a strong interest in investigating wrongdoing by charitable organizations that solicit donations in the Commonwealth. In particular, the AG claims that AMP's donor information would aid his investigation in four ways: "(1) it would tend to corroborate or disprove amounts reported on the organization's Form 990; (2) it would allow [him] to ascertain donor victims and witnesses to whom he may inquire about what representations may have been made incident to charitable solicitations; (3) it would demonstrate organizational motive (e.g., if funding was received from proxies for terrorist organizations); and (4) it would show the number of violations of the state's registration statute and, if AMP made misrepresentations in connection with charitable solicitations, the number of such violations." [Dkt. No. 15-2] at 32–33. This Court does not doubt the AG's significant interest in preventing fraud, investigating violations of state law, and probing an organization's connections to terrorism. Such conduct "cause[s] serious social harms," and as the primary law enforcement officer charged under Virginia law with combating wrongdoing by charitable organizations in the Commonwealth, the AG's interest is certainly weighty. Bonta, 594 U.S. at 612.

But the four reasons the AG articulates as to why donor information would aid his investigation reveal a "dramatic mismatch" between the interests the AG seeks to promote and the sweeping disclosure demand for AMP's entire donor list. Id. First, a narrowly tailored request for information to "corroborate or disprove amounts reported" in AMP's Form 990 could be limited to the dollar figures AMP received from its donors without seeking the identities of those donors. Moreover, to the extent the AG wishes to corroborate other information AMP has reported in its Form 990, that goal still would not justify obtaining donors' identities. Form 990 only requires the disclosure of the names of the organization's officers, directors, trustees, key employees, highest compensated employees and independent contractors, and the person who possesses the organization's books and records.[15] It does not require an organization to disclose who its donors are. Accordingly, the AG's demand for AMP's donor lists is not narrowly tailored to serve the goal of corroborating the organization's Form 990.

Second, the desire to ascertain whether donors are victims of, or witnesses to, any misrepresentations does not sustain such an expansive demand. As an initial matter, counsel for the AG represented during the October 3, 2025, hearing that the AG has not received any complaints by donors or solicitees regarding misrepresentations or fraud on behalf of AMP. This is surprising given the highly publicized nature of the AG's investigation into AMP and leads this Court to question whether such victims and witnesses exist. Nonetheless, even if some donors might not mind the disclosure of their identities to the Commonwealth, perhaps to aid in the AG's investigation or to report wrongdoing, the demand for AMP's entire donor list "creates an unnecessary risk of chilling" because it indiscriminately sweeps up the information of every

---

[15] Form 990, Dep't of the Treasury, https://www.irs.gov/pub/irs-pdf/f990.pdf.

donor on AMP's lists, including those wishing to remain anonymous. Id. at 616–17 (quoting Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 968 (1984)).

Third, the all-encompassing demand is not narrowly tailored to achieving the goal of determining whether AMP has received funding from proxies for terrorist organizations. As support for the proposition that the donor information is "directly relevant" to his investigation, [Dkt. No. 15-2] at 33 & n.8, the AG cited in his Court of Appeals brief a Northern District of Illinois order in the ongoing Boim litigation that compelled AMP to disclose small-dollar donor records from 2011 through 2018, Boim v. Am. Muslims for Palestine, No. 17-cv-3591, Dkt. No. 372 (N.D. Ill. Jan. 19, 2024). In that order, the Illinois court explained that "AMP's donor records may demonstrate that AMP relies on the same or a similar network of donors" as the now-defunct organizations found liable in 2004 for supporting Hamas, which would help the plaintiffs establish that AMP is the alter ego of those organizations. Id. at 2. As to the potential First Amendment problem, the Illinois court explained that "the privacy interests of AMP's donors can be addressed by designating the production as 'Attorneys' Eyes Only' . . . and by redacting the donors' personal contact information." Id. at 3.

The plaintiffs' request for AMP's donor lists in Boim is distinct from the AG's demand in several meaningful ways. First, the Boim request demonstrates the types of limiting features the AG could include in his demand to ensure narrow tailoring. Most importantly, the Boim request is limited to a particular time frame (2011 through 2018), whereas the AG's CID requests all of AMP's donor lists, presumably dating back to 2006 when AMP was incorporated. Second, the Boim order mandates that the parties take meaningful steps to ensure donors' privacy, including designating the donor lists as for "Attorneys' Eyes Only" and redacting contact information; however, the CID requests "[a]ll donor lists, including list-servs and email groups,"

29

[Dkt. No. 15-1] at 39, which would provide the AG with a way to directly contact most, if not all, of AMP's donors. Finally, the disclosure in <u>Boim</u> reveals only certain donors' identities to private litigants for the narrow purpose of demonstrating AMP's alleged alter ego; but disclosure here would reveal all donors' names and contact information to the state government for the purpose of investigating misconduct, with the accompanying ongoing possibility that the AG may share the list with federal or state law enforcement officers, [Dkt. No. 15] at 24 (citing Va. Code § 59.10(N)). Of course, under exacting scrutiny, the AG need not craft a demand that is a perfect fit for his intended investigation, but the demand's scope must be proportional to the interests served and should contain parameters sufficient to avoid overreach. <u>See</u> <u>McCutcheon</u>, 572 U.S. at 218.

Fourth, the need to determine the number of violations of the VSOC law fails to justify the AG's sweeping demand. As an initial matter, it is unclear how the AG could determine the number of times AMP improperly solicited funds based on how many donations AMP has received, given that many individuals who are solicited do not donate, and many donate without having been solicited. Moreover, because the VSOC law concerns only the number of times an organization solicits donations in Virginia, the AG's demand for information about all donors' identities (which could include out-of-state solicitations or donations) and the dollar amounts of their donations does not fit the legitimate justification for the investigation. Additionally, the AG's demand fails to specify a relevant time period. AMP operated in violation of the VSOC law from 2016 (when it moved its principal place of business to Virginia) until November 2023 (when it filed the necessary registration statement). Accordingly, any investigation into AMP's solicitations should be limited to that time frame. Because the AG's demand fails to specify any

parameters, the request is not narrowly tailored to achieving the goal of investigating the number of violations of the VSOC law.

In a final attempt to save its demand, the AG argues that the Supreme Court in <u>Bonta</u> "expressly sanctioned the use of investigative tools, such as subpoenas, to obtain donor information in the context of a targeted investigation." [Dkt. No. 15-2] at 28–29. This overreads that opinion. <u>Bonta</u> found facially unconstitutional a California statute that required most charitable organizations to disclose donor information to the Attorney General. 594 U.S. at 618. The Court emphasized that there were alternative mechanisms through which the state could obtain donor information, such as subpoenas and audit letters. <u>Id.</u> at 613. In other words, the <u>Bonta</u> Court observed that other tools may allow for more targeted investigations compared to categorical, "up-front" disclosure requirements. <u>Id.</u> at 613–14. In that observation, the Court did <u>not</u> dispense with the requirement that subpoenas and audit letters satisfy exacting scrutiny.

Even though the First Amendment free association claim impacts only some of the demands at issue, AMP need only establish a likelihood of success as to one of its claims to satisfy the first <u>Winter</u> factor. <u>See Roe</u>, 359 F. Supp. 3d at 410. And on this record, AMP is likely to succeed in establishing that the burdens the CID imposes cannot be justified on the ground that the demand for donor information is narrowly tailored to investigating AMP's violations of the VSOC law and links it might have to terrorist organizations.

2. Irreparable Harm

The second <u>Winter</u> factor requires AMP to show a likelihood, rather than a mere possibility, of irreparable harm. <u>Ferring Pharms., Inc. v. Watson Pharms., Inc.</u>, 765 F.3d 205, 217 (3d. Cir. 2014). The harm must be "actual and imminent," not speculative or remote in time.

Handsome Brook Farm v. Humane Animal Care, Inc., 193 F. Supp. 3d 556, 574 (E.D. Va. 2016) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)).

Without injunctive relief, AMP would have to choose between the lesser of two evils. On one hand, it could succumb to the AG's demand and disclose its donor lists before the appellate courts can rule on the constitutionality of the CID. Given AMP's likelihood of succeeding on the merits of its free association claim, choosing this path would likely result in irreparable injury because once the AG has access to the donor lists, AMP cannot un-ring the bell, even if an appellate court later found that the demand for AMP's donor lists was constitutionally infirm. See Elrod, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). On the other hand, AMP could continue to refuse to comply with the court order which is on appeal and incur $1,000 per day in sanctions with an unspecified end date. Following this route would certainly hamper AMP's ability to engage in speech-related conduct because it could force AMP to divert funds away from its workshops, seminars, trainings, and advocacy efforts in order to pay the Circuit Court's daily sanctions. In essence, either path would have a chilling effect on AMP's First Amendment activity.

The AG argues that, because AMP has the option of incurring monetary sanctions, the "absence of a temporary restraining order . . . will not result in irreparable harm." [Dkt. No. 15] at 23 (citing Advanced Training Grp. Worldwide Inc. v. Proactive Techs. Inc., 2021 WL 9860368, at *4 (E.D. Va. Jan. 8, 2021)). Although the AG is correct that, as a general rule, an injury is not irreparable if it can be undone through monetary remedies, that general rule gives way where either path AMP chose would chill, if not injure, its ability to exercise its First Amendment rights. The Fifth Circuit, albeit in a different context, reached a similar conclusion

32

in a case involving Navy service members' First Amendment and Religious Freedom Restoration Act objections to the Department of Defense's COVID-19 vaccination requirements. U.S. Navy Seals 1–26 v. Biden, 27 F.4th 336, 348 (5th Cir. 2022).  There, the court explained that the plaintiffs were faced with a choice between losing their jobs (a harm that could be remedied through monetary damages) and getting the COVID-19 vaccine (a harm that would result in irreparable constitutional injury).  Id.  The Fifth Circuit found that the plaintiffs would have "face[d] irreparable harm if judicial review [were] denied" because, "[b]y pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiff's free exercise of religion."  Id.  The same is true here: Where either of plaintiff's options would cause the loss of First Amendment freedoms, the harm is clearly irreparable.

The AG attempts to downplay the injury that disclosure would cause to donors by stating that "any information received by the Attorney General pursuant to a CID must be kept confidential and may only be disclosed in an enforcement action or provided to another state or federal law enforcement agency with similar confidentiality restrictions." [Dkt. No. 15] at 24 (citing Va. Code § 59.10(N)).  This Court is unpersuaded by that argument.  The disclosure of donor lists to the government can chill association "[e]ven if there [is] no disclosure to the general public."  Shelton v. Tucker, 364 U.S. 479, 486 (1960).  In Shelton, the Supreme Court struck down an Arkansas law requiring teachers to disclose every organization they have belonged to within the past five years and explained that even a limited disclosure to the school board places a "constant and heavy" "pressure upon a teacher to avoid any ties which might displease those who control his professional destiny."  Id.  A similar concern is relevant here. Forcing AMP to disclose its donor lists would place an immense pressure on individuals

33

affiliated with pro-Palestine organizations to avoid such ties because those ties might displease state officials who disagree with the organization's message.

Moreover, the persistent possibility of full public disclosure "widen[s] and aggravate[s] the impairment of constitutional liberty." Id. at 486–87. Indeed, a promise of confidentiality is "not worth much," Bonta, 594 U.S. at 616, when there is no "perfectly secure, fool-proof system to prevent disclosure," Thomas More Law Ctr. v. Harris, 2016 WL 6781090, *5 (C.D. Cal. Nov. 16, 2016), and "'anyone with access to a computer [can] compile a wealth of information' about anyone else," just with someone's name, "including such sensitive details as a person's home address or the school attended by his children," Bonta, 594 U.S. at 617 (quoting Doe v. Reed, 561 U.S. 186, 208 (2010) (Alito, J., concurring)). In sum, the disclosure of donor information inevitably deters First Amendment activity, even if the AG (attempts to) keep that information entirely confidential.

### 3. Balance of the Equities and the Public Interest

The third and fourth Winter factors merge when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435 (2009). These factors "call[] for assessing the harm to the opposing party and weighing the public interest." Id. Federal courts throughout the country consistently hold that "securing First Amendment rights is in the public interest." Hartford Courant Co. v. Carroll, 986 F.3d 211, 224 (2d. Cir. 2021); see Pursuing America's Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]here is always a strong public interest in the exercise of free speech rights otherwise unabridged by an unconstitutional regulation."); Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.").

Against this backdrop, the AG first argues that "[t]he public has a plain interest in ensuring its charitable contributions are legally solicited and utilized." [Dkt. No. 15] at 23. Media Matters recently rejected a similar argument, explaining that "Missouri's interest in enforcing its consumer protection laws must give way when a state actor uses them to retaliate against a media organization for protected speech." 2024 WL 3924573, at *19. So too here. The Commonwealth's interest in enforcing the VSOC law must give way when a state actor uses his authority under that statute to request information that is protected by the First Amendment right to free association.

The AG also asserts that principles of comity and federalism weigh against granting injunctive relief and explains that "[a]part from interfering with the Attorney General's investigation, those concerns are amplified because Virginia's judiciary has already adjudicated Plaintiff's challenge to the CID and refusal to comply culminating in a contempt order." [Dkt. No. 15] at 26. As previously explained, Virginia's judiciary has not fully adjudicated AMP's challenge to the CID because an appeal is currently pending. Moreover, although this Court is mindful of its duty to respect the principles of federalism and comity between the federal and state court systems, those principles must give way to this Court's ultimate duty to protect federal constitutional rights, especially where the state system thus far has failed to acknowledge the grave constitutional issues presented in this case.[16] Accordingly, the balance of the equities and the public interest tilt heavily in favor of AMP.

---

[16] The AG cites McGagh v. Supreme Court of Maryland, 2024 WL 4108529 (D. Md. Sept. 6, 2024), for the proposition that a federal court granting a temporary restraining order or a preliminary injunction would invade the inner workings of a state court and subvert foundational principles of federalism and comity. McGagh is unpersuasive because that case did not involve a claim that the state government was violating the plaintiff's federal constitutional rights.

## IV.  CONCLUSION

For the reasons stated in open court and as further explained in this Memorandum Opinion, the Court has granted AMP's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. No. 9], staying execution of the Circuit Court's September 29, 2025, order and enjoining the AG from further enforcing the CID "to the extent that it would require the disclosure of information protected by the First Amendment to the U.S. Constitution until the dispute between the parties has been fully adjudicated through the Virginia state court system."  [Dkt. No. 19].

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

Entered this 17 day of October, 2025.

Alexandria, Virginia

/s/ _____

Leonic M. Brinkema
United States District Judge